**STATE of Missouri, Respondent,**

**v.**

**Kenneth KENLEY, Appellant.**

**No. 77093.**

Supreme Court of Missouri, En Banc.

Aug. 20, 1997.

Rehearing Denied Sept. 30, 1997.

**256**

Loyce Hamilton, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Stacy L. Anderson, Asst. Atty. Gen., Jefferson City, for Respondent.

PRICE, Judge.

Kenneth Kenley was convicted and sentenced to death for the murder of Ronald Felts. Although Kenley's conviction was affirmed by this Court in *State v. Kenley*, 693 S.W.2d 79 (Mo. banc 1985), *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986), the Eighth Circuit Court of Appeals vacated the death sentence with orders to "reduce it to a life sentence without parole or conduct a new sentencing procedure." *Kenley v. Armontrout*, 937 F.2d 1298, 1309–10 (8th Cir.), *cert. denied*, 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991). After a new sentencing trial, Kenley again was sentenced to death. Kenley appeals the sentence and the denial of his Rule 29.15 motion. We have exclusive jurisdiction over the appeals. *Mo. Const. art. V, Section 3.* We affirm.

## I.

### A.

#### (Factual Background)

Kenley killed Ronald Felts during a crime spree that occurred in Poplar Bluff, Missouri, during the late hours of January 3 and the early hours of January 4, 1984. The crime spree was the culmination of a series of robberies planned by Kenley and his cousin to gain money to purchase drugs and to help his grandmother. In preparation for the crime spree, Kenley broke into a sporting goods store and stole some guns. On January 2, Kenley purchased a box of .38 caliber hollow point bullets and practiced shooting at cans and trees.

At about 11:15 p.m. on January 3, Kenley entered the Kater Inn package store wearing a ski mask and holding a .38 caliber pistol. After the store clerk emptied the cash register into a bag, Kenley grabbed a bystander, Sandra Buttry, and forced her into a brown station wagon that he had borrowed from a friend. Kenley commanded Ms. Buttry to unzip his pants and perform oral sex on him, but Ms. Buttry was unable to unzip the pants. While Kenley unzipped his pants, Ms. Buttry located the door handle and jumped from the moving vehicle. Kenley shot her in the back as she exited the vehicle. Kenley returned to where he had shot Ms. Buttry, but drove on when he saw she was receiving aid from a passing motorist. Ms. Buttry survived.

Shortly after midnight, Kenley entered the Blue Moon Tavern and announced a hold-up. He ordered everyone to empty their pockets and lie down. When nobody immediately reacted, Kenley pulled his gun from his pocket and pointed it at Ronald Felts, who was standing approximately twenty feet away. He shouted, "This is a hold up—hit the floor—I mean business. I'll kill you just like I'm going to kill him." Kenley fired a single shot that struck Mr. Felts in the head and killed him.

Kenley then told the owner of the bar, Ellen White, to open the cash register. Kenley grabbed the money, kicked Ms. White and Randy Jenkins, and instructed them to get up and leave with him. When the pair reacted slowly, Kenley fired a warning shot over their heads. Kenley told Ms. White that she would have to perform oral sex on him or be killed. Kenley then changed his mind about taking Jenkins and shot him in the face. Jenkins survived.

Kenley left the tavern with Ms. White. In his haste to leave, Kenley backed the station wagon onto a curb and got it stuck. Kenley decided to take Ms. White's car instead, but the keys to the car were in the bar. When

Kenley and Ms. White entered the kitchen where her keys were, Kenley found fifteen-year-old Lori Spralding hiding there. Kenley put his gun to her forehead and asked if she had called the police. Although the girl responded that she had not, Kenley threatened to kill her anyway. Hoping to distract Kenley, Ms. White grabbed the keys and left the kitchen. Kenley followed her and left Spralding there. While she was driving, Ms. White was able to trick Kenley into believing that she needed to open her door to see because the windows were fogged over. Ms. White leapt from the moving car and ran to safety. She heard Kenley's gun click but it did not fire.

At around 12:30 a.m., Kenley arrived at the Coachlight Motel. The motel was owned by Ollie Gaultney and her husband, Truman. Kenley pulled his gun on Mrs. Gaultney and demanded money. When Mr. Gaultney entered the office, Kenley pointed the gun at him and said, "I'll kill you. I've killed already tonight and I'll kill you." Mrs. Gaultney heard the gun click, but again it did not fire. A struggle ensued between Mr. Gaultney and Kenley with Kenley being forced outside the office. When Mr. Gaultney retrieved a shotgun, Kenley left. Mr. Gaultney fired three shots at the radiator of Ms. White's car while Kenley sat in the car reloading his gun. Kenley then drove away.

By that time, police were searching for Kenley. Police officers from Clay County, Arkansas, positioned themselves at the state line and the Corning Police Department set up a road block a few miles farther south. When Kenley crossed the state line, two officers pursued him to the roadblock. Kenley maneuvered around the roadblock but lost control of his car on an ice patch. The police officers disabled the car with gunshots to the radiator and front tire. Kenley fled after firing three shots at the police officers. After the officers returned fire, Kenley fired two more shots and escaped across a field.

Shortly after 1:30 a.m., Kenley arrived at Junior's Food Mart, in Corning, Arkansas. Kenley fired a warning shot into the ceiling and demanded a car and a driver. When no one volunteered, Kenley proclaimed, "I've done killed once tonight. Wouldn't bother me to do it again." Somebody in the store pointed out his car and told Kenley that the keys were in it. As Kenley drove out of the parking lot, police officers manning the nearby roadblock drew their guns, approached the car, and ordered Kenley to stop. Kenley surrendered because "the odds were not in his favor." In response to being read his *Miranda* warnings, Kenley told the officers, "You all were lucky." While being transported to the Corning jail, Kenley asked if the person he shot in Missouri had died.

## B.

### (Procedural Background)

#### 1.

Following a jury trial, Kenley was convicted of capital murder and received the death penalty. In a separate trial, Kenley was convicted of three counts of robbery in the first degree, two counts of kidnapping, two counts of assault in the first degree, and one count of stealing. The capital murder conviction and sentence were affirmed on direct appeal by this Court. *State v. Kenley,* 693 S.W.2d 79 (Mo. banc 1985), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986). The convictions for the other crimes were affirmed on direct appeal by the Court of Appeals, Southern District. *State v. Kenley,* 701 S.W.2d 185 (Mo.App.1985).

Kenley sought post-conviction relief from each of the convictions by filing two separate Rule 27.26 motions. The motions were consolidated for hearing and denied. *Kenley v. State,* 759 S.W.2d 340 (Mo.App.1988). This Court denied Kenley's application for transfer from the denial of post-conviction relief. Kenley then filed for a writ of habeas corpus in the United States District Court for the Eastern District of Missouri. The federal district court denied Kenley's petition. He then appealed that decision to the United States Court of Appeals for the Eighth Circuit. *Kenley v. Armontrout,* 937 F.2d 1298 (8th Cir.), *cert. denied, sub. nom., Delo v. Kenley,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991).

The Eighth Circuit affirmed the district court's denial of relief in regard to the guilt

phase of Kenley's trial. The Eighth Circuit held that due to overwhelming evidence of guilt, Kenley was not prejudiced by his counsel's ineffective assistance. The Eighth Circuit, however, reversed the denial of relief in regard to the sentencing phase. The Eighth Circuit found that trial counsel was prejudicially ineffective for failing to conduct a reasonable investigation into mitigating circumstances. The Eighth Circuit noted many factors that indicated that Kenley's appointed counsel for the first sentencing was not effective. First, counsel only had been out of law school for three months at the time he was appointed and had only tried one misdemeanor robbery trial by the time trial began. *Id.* at 1299–1300. Counsel only logged fifty hours of pre-trial preparation before Kenley's trial. *Id.* at 1300. Counsel sought and received little outside assistance in preparing the case. *Id.* Prior to the capital trial, counsel waived an automatic change of venue despite wide publicity of Kenley's crimes. *Id.* During voir dire, counsel performed very little inquiry into the attitudes of the jurors toward capital punishment. *Id.* At the capital sentencing, counsel submitted no mitigating evidence, unwittingly made reference to Kenley's failure to testify, and did not object to evidence regarding the deterrent effect of the death penalty. *Id.*

The Eighth Circuit also identified numerous factors indicating that counsel was utterly unprepared to defend Kenley at sentencing. Counsel failed to interview two doctors, Dr. Manion and Dr. Richards, who had treated or diagnosed Kenley in the past. *Id.* at 1308. Counsel did not review the doctors' reports or Kenley's military file, which contained some evidence of a potential "extreme personality or emotional disorder or disturbance." *Id.* Counsel failed to interview family witnesses concerning Kenley's history and his condition on the morning of the crime. *Id.*

Based on its assessment that counsel was utterly unprepared to defend Kenley, the Eighth Circuit reversed the denial of habeas relief in regard to the sentencing phase and remanded the case to the district court "with instructions that the State of Missouri be required to vacate Kenley's death sentence and either reduce it to a life sentence without parole or conduct a new sentencing procedure." *Id.* at 1309–10.

2.

The State elected to hold a new sentencing hearing. In addition to offering all the evidence it offered in the original sentencing trial, the State offered evidence of Kenley's prior conviction for stealing, his conviction for the other crimes committed during the crime spree, and eighty-nine prison conduct violations, including forty-seven violations that occurred after the 1984 crime spree.

The State also introduced evidence of Kenley's conviction for stabbing an inmate while he was incarcerated at the Jefferson City Correctional Center. Over defense counsels' objection, prison guard Rollie Brizendine testified that in March 1985 Kenley pulled out a homemade ice-pick and began chasing an inmate in a fenced recreation yard. Kenley caught the inmate, whose hands were cuffed behind his back, and stabbed him in the chest. The State introduced into evidence two homemade ice-picks confiscated from Kenley after the incident and a certified copy of the conviction for first degree assault.

Finally, the State introduced evidence of Kenley's conviction for possession of a prohibited article in a correctional institution related to a hostage incident in the Potosi Correctional Center. The State offered evidence that on April 19, 1992, Kenley took the librarian of the prison, Ms. Judy Robart hostage for two hours. During the incident, Kenley used the cutting blade of a paper cutter to keep Ms. Robart hostage and the prison staff at bay. At one point, Kenley swung the blade and hit a prison official who had been sent in to intervene. Superintendent Paul Delo testified that, if Kenley had not released Ms. Robart by four o'clock, a last resort plan to end the crisis would have been put into action. The plan called for Delo to distract Kenley and tackle Ms. Robart. A prison guard would then shoot Kenley. The plan was never put into action because Kenley surrendered at around three o'clock. The State admitted into evidence a certified copy of the conviction for possession

of a prohibited article in a correctional institution.

Kenley was represented at the new sentencing trial by Karen Kraft and Robert Wolfrum. Ms. Kraft had tried seventeen capital cases prior to this case and currently serves as the director of the state public defender capital litigation division. At the hearing, Kenley did not testify, but presented new evidence through the videotaped deposition of Dr. Manion and the testimony of Lois Crownover. Dr. Manion, a board certified psychiatrist who had treated Kenley in his teenage years, testified about Kenley's dysfunctional relationship with his father. Dr. Manion concluded that Kenley's behavioral problems arose out of his identification with his father's methods of coping and expressing anger. Dr. Manion also testified that Kenley previously attempted suicide.

Ms. Crownover, a social worker in the Poplar Bluff school system, testified that she knew Kenley since he was eleven years old. Ms. Crownover described Kenley as an uncooperative child who threw tantrums, went into wild rages, misbehaved in the classroom, bullied other children, made dire threats when angry, avoided responsibility for his actions, and was friendless and unhappy. Ms. Crownover testified that Kenley's relationship with his father was erratic and unstable. She also testified that Kenley was unable to develop relationships with his classmates in school. Because of Kenley's problems at home and school, Ms. Crownover recommended that he be taken out of his home, and that he be evaluated by Dr. Manion. Finally, Ms. Crownover testified that, about two months before the crime spree, Kenley visited her and told her that he needed a psychiatrist because he was losing control.

Kenley also introduced evidence from psychiatric records related to his treatment at the Farmington state hospital. Additionally, records of Kenley's father's psychiatric treatment were introduced. Finally, the testimony of four witnesses, including Ms. Robart, the prison librarian who was taken hostage by Kenley, Kenley's mother, and two of Kenley's cousins, was introduced. Ms. Robart testified that Kenley was a good and conscientious worker in the library. She further testified that during the hostage incident, Kenley appeared to be on drugs. She testified that he did not harm her or make threats at the negotiators and was full of remorse for his actions. Kenley's mother testified about his relationship with his father, that he was often in trouble at school, and that he was treated for emotional problems at Farmington State Hospital. Kenley's two cousins testified that Kenley's relationship with his father was strained and distant.

At the conclusion of the evidence, the jury recommended that Kenley be given the death penalty. The court sentenced Kenley in accordance with the jury's recommendation.

### 3.

Kenley filed a Rule 29.15 motion for post-conviction relief. Kenley contended that trial counsel was ineffective for failing to present medical experts to rebut the State's expert, Dr. Parwatikar, and for failing to object to a number of remarks made during the prosecutor's closing argument. Dr. Parwatikar had testified that Kenley suffered from an anti-social personality disorder. Kenley called three defense witnesses who testified that they interviewed Kenley or performed tests on him and reviewed Kenley's Farmington state hospital records and military records, Dr. Manion's psychiatric evaluation, Dr. Parwatikar's report, the department of corrections files for Kenley, and the testimony of numerous witnesses regarding Kenley's background. Each concluded that Dr. Parwatikar's assessment of Kenley was incomplete and inaccurate, and that further investigation would have uncovered more serious psychological or emotional disorders. Dr. Smith and Dr. Peterson concluded that Kenley had diminished capacity at the time of the crime and that he suffered from a borderline personality disorder.

Kenley introduced into evidence a report created from a diagnostic interview with Dr. Peterson. The report gave detailed accounts of Kenley's life from his childhood to the months preceding the crime spree. The report also described Kenley's account of the events of the night of the murder. Kenley

also offered the testimony of Karen Kraft, who represented Kenley at the re-sentencing. Ms. Kraft testified that she made a conscious decision, after discussion with co-counsel, to not have Kenley re-evaluated. To support his contention that counsel was ineffective for failing to object to the prosecutor's remarks, Kenley questioned Ms. Kraft about the propriety of the remarks and whether the remarks were objectionable.

At the close of the evidence, the motion court stated, "Court will render a ruling in writing and furnish it to you in due course." Six days after the close of the Rule 29.15 hearing, the motion court issued a four-page judgment denying Kenley's thirteen point motion for post-conviction relief. In response, the attorney general requested more detailed findings of fact and conclusions of law in order to facilitate meaningful appellate review. The attorney general submitted a twenty-nine page proposed judgment. The attorney general notified Kenley's attorney of its intention to request more detailed findings of fact and conclusions of law, supplied a copy of its proposed findings to Kenley's attorney, and recommended that Kenley's attorney submit proposed findings. Kenley neither objected to the proposed findings of fact and conclusions of law submitted by the attorney general nor submitted an alternative proposed findings of fact or conclusions of law. The motion court adopted the attorney general's findings in whole as the amended findings of the court. Kenley's motion for post-conviction relief was overruled.

### 4.

Kenley now appeals his sentence of death and the overruling of his Rule 29.15 motion. Kenley alleges that: (1) the motion court erred by adopting in whole the prosecutor's proposed findings of fact and conclusions of law; (2) the motion court erred in denying Kenley's Rule 29.15 motion because trial counsel was ineffective for failing to rebut the prosecution's expert testimony that Kenley suffered from an anti-social personality disorder, failing to present evidence of Kenley's mental state at the time of the crime and evidence of aggravating circumstances, and failing to object to allegedly improper statements by the prosecutor; and (3) the trial court erred in overruling Kenley's objection to the admission of Kenley's conduct during his incarceration, after his conviction of murder, overruling Kenley's motion to strike an aggravating circumstance, overruling Kenley's objection to the prosecution giving rebuttal argument during summation, and in submitting the reasonable doubt instruction.

### II.

■ In his first point on appeal, Kenley argues that the motion court erred by adopting in whole the State's proposed findings as the amended findings of the court. Kenley asserts that the proposed findings were biased and misstated the evidence and that the motion court's adoption of those findings did not reflect an independent judicial evaluation of the evidence. Kenley claims that his constitutional rights were violated by the court's judgment.

■ The trial court retains control over judgments for thirty days after the entry of the judgment and can vacate, reopen, correct, amend, or modify its judgment within that time for good cause, after giving the parties an opportunity to be heard. *Rule 75.01.* Kenley was given notice of the State's intention to submit proposed findings and was supplied a copy of the State's proposed findings. Kenley, however, did not propose any findings of his own and did not raise his constitutional objection, or any other objection, to the State's proposed findings. To preserve appellate review, constitutional claims must be made at the first opportunity. *State v. Parker,* 886 S.W.2d 908, 925 (Mo. banc 1994), *cert. denied,* 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). The purpose of the timeliness rule is to allow the trial court the opportunity to correct errors and avoid prejudice in the first instance. *See State v. Sutherland,* 939 S.W.2d 373, 379 (Mo. banc 1997). Because Kenley did not timely object to the motion court's action, any issue regarding the motion court's adoption of the prosecutor's proposed findings of fact and conclusions of law is not preserved for appellate review. Even if we were to

review the court's adoption of the findings, review would offer no relief to Kenley.

■ Adopting all or part of a party's proposed findings, or adopting by reference the wording of a party's motion, has become a common practice among lawyers and judges in both criminal and civil cases. *State v. White*, 873 S.W.2d 590, 600 (Mo. banc 1994). As long as the court thoughtfully and carefully considers the parties' proposed findings and agrees with the content, there is no constitutional problem with the court adopting in whole or in part the findings of fact and conclusions of law drafted by one of the parties. *White, supra,* at 600. "Those findings, though not the product of the workings of the district judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence." *United States v. El Paso Natural Gas. Co.,* 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964).

Kenley asserts four general areas in which the court's findings were not supported by evidence and did not reflect an independent judgment by the court. Our examination of the record, however, proves otherwise.

### A.

■ Kenley challenges the motion court's findings 35, 36, and 37 regarding the testimony of Dr. Cowan. The three findings of fact relating to Dr. Cowan's testimony are most easily evaluated when read together:

35. Dr. Dennis Cowan, a psychologist, testified that Movant is suffering from mild brain damage. In the opinion of Dr. Cowan this brain damage is the result of chronic substance abuse or a closed head trauma. The Court does not find Dr. Cowan to be credible or his testimony to be persuasive.

36. Even if the Court were to credit Dr. Cowan's testimony, it offered little insight to Movant's mental state at the time of the offense or Movant's culpability for his acts. Dr. Cowan could not testify as to when Movant sustained the brain damage he contends Movant now suffers. Dr. Cowan could not state with certainty that Movant was impaired on January 3–4, 1984. Moreover, Dr. Cowan could not attribute Movant's criminal behavior to the impairment he suffers.

37. Finally, there are no medical records to support Dr. Cowan's conclusion that Movant suffered closed head injury either at birth or during a car accident. Moreover, the fact that Movant's condition may be the result of self-induced intoxication from drugs or alcohol or the result of a car accident that occurred while Movant was intoxicated and driving at a high rate of speed, garners little sympathy for his condition.

Evidence in the record supports the motion court's finding in paragraph 35 that Dr. Cowan was not a credible or persuasive witness regarding Kenley's brain damage. Dr. Cowan's conclusion is in conflict with Dr. Parwatikar's, Dr. Peterson's, and Dr. Smith's expert medical assessment of Kenley. First, Dr. Cowan attributed Kenley's cognitive difficulties to frontal lobe dysfunction and organic brain damage, whereas Dr. Peterson testified that "[c]ognitive difficulties are a common symptom of depression." Dr. Cowan attributed Kenley's angry outbursts to poor impulse control due to mild brain damage, whereas Dr. Peterson claimed that Kenley learned from his upbringing that poor impulse control—actually, "mood swings, rage attacks, intimidation through anger, anger response, unbridled anger"—was the norm for relationships. Dr. Smith testified that Kenley's poor impulse control and aggressive behavior were learned from his father's behavior. Dr. Parwatikar attributed the outbursts to an anti-social personality disorder.

Second, Dr. Cowan's assessment that Kenley's brain damage was manifested in poor memory is not supported by the report that Dr. Peterson prepared with Kenley eleven years after the crime spree. In that report, Kenley remembered innumerable details of his life, the twenty burglaries he committed during October and November, 1983, the events of the days preceding the crime spree, and the details of each crime he committed during the spree. This assessment also conflicts with Dr. Smith's diagnosis that Kenley

had "fair memory for remote events, adequate recent memory."

Third, Dr. Cowan testified that Dr. Parwatikar's assessment that Kenley only suffered from an anti-social personality disorder, not from brain damage, was inaccurate and incomplete. Dr. Parwatikar based his conclusion partly on the results of a Bender–Gestalt test performed on Kenley. Dr. Cowan criticized that test as inaccurate and outdated. That assessment, however, is in conflict with what defense expert Dr. Peterson testified. Dr. Peterson testified that the Bender–Gestalt test is "a very good test."

■ Evidence in the record also supports the motion court's finding in paragraph 36 that Dr. Cowan's assessment of Kenley offered little insight into Kenley's mental state on the night of the crimes. Dr. Cowan's opinion that Kenley's mental state on the night of the murder was one of uncontrollable "gut level" responses is not supported by the police report, Kenley's account to Dr. Peterson, and eye witness testimony, which represented Kenley as cool and deliberative during a planned crime spree. Evidence demonstrated that Kenley broke into a sporting goods store to steal guns and that Kenley practiced target shooting. Evidence further demonstrated that Kenley shot Ronald Felts in order to establish control of the Blue Moon Tavern. He chose not to shoot a fifteen-year-old girl hiding in the Blue Moon Tavern, after having placed the gun to her forehead. Kenley planned to wear a ski mask to commit the robberies, but then decided not to wear one into the Blue Moon Tavern because he knew he would "get the case regardless." On numerous occasions, Kenley warned that he had already killed that night and would kill again if he needed to. After having eluded the police in one shoot-out, Kenley turned himself in when he was surrounded by police and "the odds were not in his favor." Dr. Cowan never read the trial transcript or the police report of the events and never questioned Kenley about the circumstances of the crimes. As the motion court noted, for Dr. Cowan's testimony to have been helpful, Dr. Cowan needed to tie his diagnosis directly to Kenley's actions on the night of the crime.

Evidence in the record supports the motion court's findings in paragraphs 36 and 37 that Dr. Cowan could not testify as to when Kenley sustained brain damage, that Dr. Cowan could not state with certainty that Kenley was impaired on the night of the murder, and that no medical records support Dr. Cowan's conclusion that Kenley suffered a closed head injury. Dr. Cowan based his conclusion that Kenley suffered from brain damage on an unsupported hypothesis of damage caused by the use of forceps at birth, unsubstantiated testimony of a trauma to Kenley's head that occurred sometime between the ages of sixteen and eighteen, controverted evidence of chronic substance abuse, and purported deficits in memory functioning, abstract reasoning, decision making, judgment, problem solving, speed of mentation, and complex motor functioning. Dr. Cowan testified, however, that he did not know when the car accident that allegedly caused Kenley's brain damage occurred and that he did not have any medical records or a police report that verified the occurrence of the accident. He also acknowledged that he had no "basis for concluding that the forceps procedure resulted in brain damage." Dr. Cowan acknowledged that he could not testify that "Kenley's impairments caused him to commit these crimes."

■ Finally, the motion court's finding in paragraph 37, that attributing Kenley's mental state to alcohol or substance abuse garners little sympathy, is supported by the evidence. On cross-examination, Ms. Kraft acknowledged that claiming drug and alcohol abuse as a mitigating factor "is not always something that causes sympathy to the jury." She further acknowledged that such a claim can be seen as an aggravating factor by some jurors.

The court's findings regarding Dr. Cowan are supported by evidence in the record and reflect an individual judicial evaluation.

### B.

■ Next, Kenley challenges the court's findings in regard to Dr. Smith's testimony that Kenley was in a state of diminished capacity at the time of the crime spree due to

a personality disorder and intoxication. The court did not find Dr. Smith's assessment that Kenley was unable to deliberate on his criminal acts to be credible.

38. Dr. Robert Smith, a psychologist, also testified on Movant's behalf. Dr. Smith diagnosed Movant as suffering Alcohol Dependence, Cocaine Dependence, and Sedative Dependence. Dr. Smith also diagnosed Movant as suffering from a Borderline Personality Disorder. Dr. Smith attributed Movant's criminal activity to his drug abuse. Dr. Smith based his conclusion that Movant suffered from drug and alcohol dependence on Movant's self-reported drug use.

39. It almost goes without saying that an expert's opinion is only as good as the facts upon which he bases that opinion. Likewise, an expert's opinion is worth very little if a defendant does not establish that the facts relied on by the expert are in fact true and accurate. There is no evidence in the record that Movant has or had a substance abuse problem.

40. Although the doctors testified in this case that Movant reported that he has been abusing drugs and alcohol since the approximate age of 11, the Court finds this evidence unreliable because it is hearsay, because the Court has not had the opportunity to assess the credibility of Movant's statements, and because the doctors unquestioningly accepted Movant's statements of drug and alcohol abuse while at the same time acknowledging that self-reports of drug use are inherently unreliable.

41. None of the persons who knew Movant prior to 1984 indicated that Movant had a substance abuse problem. Neither Mrs. Crownover's testimony nor her records reflect that she believed Movant had a drug or alcohol problem. The Farmington State Hospital records do not indicate that Movant was using or abusing drugs. Neither Dr. Manion's testimony nor her records indicate that she believed Movant was abusing alcohol or drugs. None of the family members that testified on Movant's behalf indicated that Movant had a substance abuse problem. The pris-

on records do not indicate that Movant had a substance abuse problem. There is no record of Movant seeking or receiving treatment for a substance abuse problem. Movant has committed other criminal acts while not under the influence of drugs or alcohol. Movant did not testify that he had a substance abuse problem. There is no objective evidence sustaining Movant's claim that he suffered from a drug or alcohol problem.

42. Movant's statements to the doctors regarding his substance abuse problem are contradictory and inconsistent, further highlighting their unreliability. Movant told Dr. Parwatikar shortly after the offense that he was not under the influence of drugs or alcohol at the time of the offense. Movant told Dr. Smith that he was only under the influence of alcohol at the time of the offense. Movant, however, told Dr. Peterson that in addition to consuming alcohol he had smoked at least one marijuana cigarette. These contradictory statements underscore the unreliability of Movant's self-reports concerning his history of drug use or abuse.

43. It is Dr. Smith's opinion that Movant was suffering from these disorders at the time of the offenses and was under the influence of alcohol at the time he committed the crimes. Based on personality disorder and intoxication, Dr. Smith concluded that Movant was in a state of diminished capacity and was unable to deliberate on his criminal acts. The Court does not find Dr. Smith to be credible.

44. The Court has reviewed the penalty-phase testimony and finds ample evidence that Movant had the capacity to, and did in fact, deliberate on his actions that night. Moreover, Movant's account to Dr. Peterson of his actions and thoughts while committing these crimes, shed further light on Movant's ability to reason and deliberate. Likewise, the Court finds Movant's actions are inconsistent with the degree of intoxication or impairment suggested by Dr. Smith. This evidence taken together with Dr. Parwatikar's testimony that Movant had the capacity to know right from wrong and to conform his conduct to the law, among other reasons,

leads the Court to reject Dr. Smith's testimony.

The court's seven findings of fact dealing with Dr. Smith all relate to his conclusion that Kenley suffered from a substance abuse problem, which diminished his capacity to reason and deliberate.

The motion court's findings in paragraphs 38 and 40 relate to evidence of Kenley's alleged alcohol abuse. Evidence in the record supports the motion court's finding in paragraph 38 that Dr. Smith's conclusion that Kenley suffered from substance abuse was based primarily on Kenley's reports of drug and alcohol abuse. Dr. Smith testified that he concluded that Kenley suffered from a substance abuse problem by conducting the Michigan Alcohol Screening Test and the Drug Abuse Screening Test on Kenley. Dr. Smith further testified that the results of the tests were gleaned from the answers provided by Kenley.

Evidence in the record also supports the court's finding in paragraph 40 that the self-reported substance abuse evidence was unreliable because it was hearsay and because Kenley's experts acknowledged that self-reports of drug use are inherently unreliable. Kenley's self-reports of drug use were hearsay statements. The statements were made out-of-court and were used to prove the truth of the matter asserted—that Kenley abused drugs. *See State v. Sutherland,* 939 S.W.2d 373, 376 (Mo. banc 1997). Kenley's statements are unreliable because he never testified in court in regard to his alleged substance abuse problems. The court could not judge the credibility of the statement. Moreover, Dr. Cowan warned that self-assessments by people with "chronic substance abuse" "might not be the most reliable assessments of themselves." Dr. Peterson criticized as unreliable Dr. Parwatikar's acceptance of Kenley's accounts of his own substance abuse.

Evidence in the record supports the motion court's findings in paragraphs 39 and 41 that there was a lack of objective evidence of Kenley's substance abuse problems. None of the defense witnesses who knew Kenley prior to 1984, including his family, Dr. Manion, and Mrs. Crownover, testified that he abused alcohol or drugs. None of the military, prison, or hospital records documented a substance abuse problem or any efforts to treat such a problem. Dr. Smith acknowledged that Kenley had committed other crimes while not under the influence of drugs.

The motion court's finding in paragraph 42, that Kenley's self-reports of substance abuse are unreliable because of the conflicting accounts, is supported by evidence in the record. The record indicates that Kenley gave three different accounts of what substances he used and how much he ingested on the night of the crime spree. He told Dr. Parwatikar that he did not use any alcohol or drugs on the night of the crime. Dr. Smith testified that Kenley admitted to drinking twelve to fourteen beers and four shots of whiskey. Kenley reported to Dr. Peterson that he drank at least twelve beers and smoked seven or eight marijuana cigarettes, but did not drink any hard liquor.

Finally, paragraphs 43 and 44 of the motion court's findings are supported by evidence in the record. There is no credible evidence that Kenley was intoxicated while he committed the crimes. One witness testified at deposition that she smelled alcohol on Kenley's breath, but at sentencing did not remember whether she smelled alcohol without the goading of defense counsel. Four other witnesses testified that Kenley did not appear drunk during the crime spree.

Moreover, Dr. Smith's conclusion that Kenley was incapable of deliberating on the night of the murder does not comport with Kenley's account to Dr. Peterson in the diagnostic interview. Kenley's account of his crime spree is replete with examples of his ability to reason, plan, and deliberate. The report indicated that Kenley reasoned that the Kater Inn would be a good target because it would have extra money in the register from the recent New Year's celebration. When Kenley saw Ms. Buttry, he planned to kidnap her for sexual purposes and then kill her so she could not identify him. On numerous occasions, Kenley warned that he had killed before and would kill again if he had to. He considered robbing a truckstop but reasoned that he could not get away with it. He decided not to wear a ski mask

because he felt that he would "get the case regardless." Kenley felt that the police were on his trail so he decided to rob the Coachlight Inn to finance his flight to Arkansas. When he realized that "the odds were not in his favor," Kenley surrendered to the police.

The court's findings regarding Dr. Smith are supported by evidence in the record and reflect an individual judicial evaluation.

## C.

Kenley next challenges the court's findings pertaining to the testimony of Dr. Peterson.

45. Dr. Stephen Peterson also testified on Movant's behalf. Dr. Peterson diagnosed Movant as suffering from a Major Depressive Disorder, Dementia, Polysubstance Dependence, Borderline Personality Disorder, Severe, and a history of closed head trauma. Dr. Peterson offered his opinion that Movant had a deprived developmental background and his opinion that Movant's criminal behavior was due to a rage reaction that impaired his ability to control his violent impulses. Dr. Peterson attributed Movant's criminal conduct on January 3–4, 1984 to an uncontrollable rage. The Court does not find Dr. Peterson's testimony worthy of belief.

46. Dr. Peterson's opinion is inconsistent with Movant's behavior on the night in question. Movant's actions were not reactive. Movant was not provoked into anger. Movant chose to go to the Kater Inn and went there with the purpose of committing an armed robbery. Movant chose to go to the Blue Moon Tavern and went there with the purpose of committing an armed robbery. Movant chose to go to the Coachlight Inn and he went there with the purpose of committing an armed robbery. Movant was not reacting to his situation. He was actively creating that situation that ultimately lead to the death of Mr. Felts and the serious injury of two others. Moreover, there was no evidence introduced at the penalty-phase that indicates that Movant was in a state of rage at the time of the crime spree.

47. Dr. Peterson's testimony is inconsistent with Dr. Parwatikar's conclusion that Movant's actions were not the product of psychomotor rage. This Court finds Dr. Parwatikar's testimony to be persuasive and credits his conclusion that Movant's actions were not the result of a rage reaction.

Dr. Peterson testified that, "Kenley was deprived of normal socialization, normal control of his anger, and this greatly contributed to his behavior that night. The things he was deprived of included normal anger control; that he was under the influence of alcohol, which had been well known to induce or prolong rage attacks in him." Therefore, paragraph 45 was supported by evidence in the record.

Evidence in the record also supports the motion court's conclusion in paragraphs 46 and 47 that Kenley was not provoked into anger and was not reacting in rage. Evidence shows that a few days prior to the crime spree, Kenley broke into a sporting goods store and stole some guns, purchased a box of ammunition, and practiced his sharpshooting. Evidence shows that Kenley had a history of planning and committing burglaries. Evidence shows that, in order to get money, Kenley planned the robberies that led to the murder Ronald Felts. When he entered each of the three establishments that he robbed on the night of the crime spree, he announced that a hold-up was in progress. From this evidence, it was reasonable for the court to have found that Kenley intended to commit armed robberies at each of the locations and that he was actively creating the situation, not merely reacting to the situation, that ultimately led to the death of Ronald Felts.

Furthermore, evidence supports the motion court's finding that Dr. Peterson's testimony of Kenley's alleged state of rage during the crime spree was inconsistent with Kenley's behavior that night. *See Section II–B, supra.*

The court's findings regarding Dr. Peterson are supported by evidence in the record and reflect an individual judicial evaluation.

## D.

Finally, Kenley challenges the motion court's finding that the testimony of Karen

Kraft was credible because Kraft allegedly was ineffective in her representation of Kenley. The ineffective assistance of counsel claim is addressed in *Sections III and IV, infra.*

### E.

Based on the evidence in the hearings on the motion for post-conviction relief, there is no reason to doubt that the court made its own determination of the actual facts and decided that the state's proposed findings of fact and conclusions of law were correct.

### III.

In Points II, III, and IV, Kenley contends that the motion court erred in failing to find his counsel ineffective because: (1) counsel failed to investigate and present evidence at trial to rebut Dr. Parwatikar's assessment that Kenley suffered from an anti-social personality disorder and not from brain damage; (2) counsel failed to present evidence at trial of Kenley's mental state on the night of the murder; and (3) counsel failed to investigate and present evidence at trial to mitigate the numerous aggravating circumstances presented by the State.

### A.

To prove ineffective assistance, the defendant must show that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney, and that the defendant was thereby prejudiced. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984); *State v. Wise,* 879 S.W.2d 494, 524 (Mo. banc 1994), *cert. denied,* 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). To prove prejudice, the defendant must show a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Shurn,* 866 S.W.2d 447, 468 (Mo. banc 1993), *cert. denied,* 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). In the context of death penalty sentencing, prejudice can be defined as a reasonable probability that, but for counsel's deficient performance, the jury would have concluded the balance of aggravating and mitigating circumstances did not warrant death. *Strickland, supra,* at 695, 104 S.Ct. at 2068–69.

Trial strategy is not a ground for ineffective assistance of counsel. *Shurn, supra,* at 468. Generally, the selection of witnesses and the introduction of evidence are questions of trial strategy and virtually unchallengeable. *Leisure v. State,* 828 S.W.2d 872, 875 (Mo. banc), *cert. denied,* 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland, supra,* at 691, 104 S.Ct. at 2066. "[T]he defendant must overcome the presumption that, under the circumstances, that challenged action might be considered sound trial strategy." *Id.* at 689, 104 S.Ct. at 2065; *Sanders v. State,* 738 S.W.2d 856, 857 (Mo. banc 1987) (noting that defendant's burden to overcome the presumption of effectiveness is heavy).

Appellate review of the motion court's findings of fact and conclusions of law on a Rule 29.15 motion is limited to a determination of whether the findings and conclusions of the court are clearly erroneous. *Rule 29.15(k); see also Parker, supra,* at 929. Findings and conclusions are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite impression that a mistake has been made. *Parker, supra,* at 929.

### B.

#### 1.

To support his claims in Points II and III of his brief that defense counsel was ineffective because counsel failed to call one or more expert witnesses to rebut Dr. Parwatikar's testimony and because defense counsel failed to present evidence of Kenley's mental state on the night of the murder, Kenley presented the testimony of three expert medical witnesses and Ms. Kraft, one of Kenley's attorneys for the sentencing. Each of the three medical experts testified that Dr. Parwatikar's assessment was inaccurate and

based on insufficient data. They also testified that, with further evaluation, evidence of brain damage and lack of impulse control on the night of the crime spree could have been uncovered.

Dr. Parwatikar is an independent psychiatrist who works part-time with the department of mental health. Kenley's counsel in the first trial, not the prosecutor, requested Dr. Parwatikar's evaluation of Kenley's mental condition. At trial, Dr. Parwatikar stated that he has testified for defendants eighty percent of the times that he has been asked to testify. He also testified that he has conducted over fifteen hundred forensic evaluations of persons accused of crimes. Dr. Parwatikar concluded that Kenley did not suffer from brain damage, had the capacity to know right from wrong, and was able to conform his conduct to the law.

Ms. Kraft, who currently serves as the director of the capital litigation division of the state public defender system, testified that she had tried seventeen capital cases prior to the hearing. She further testified that she and her co-counsel discussed whether to get any additional psychological evaluations:

(By defense counsel)

Q. In reviewing the records that you did have, did you have any concerns that maybe Kenneth needed to have further evaluations.

(By Ms. Kraft)

A. We—Bob and I did discuss whether or not to do any additional evaluations of Kenneth psychologically, yes, we did.

* * * *

Q. Did you know or have any reason to believe that there was a possibility that Dr. Parwatikar might be called at the retrial to testify again that Kenneth had anti-social personality disorder?

A. We were aware that if we presented evidence of Kenneth's mental status, that Dr. Parwatikar could be called as a witness,

Q. Understanding that, did you consider giving the records that you did have to someone, an independent expert, defense expert, just to review, to tell you whether or not Kenneth needed some further testing?

A. As I stated earlier, Mr. Wolfrum and I did discuss whether or not to do a psychological evaluation of Kenneth at the time we were representing him. I don't recall if we specifically discussed giving the records to another person to evaluate the records, but we did not give the records to anyone else to evaluate.

* * * *

Q. Were you aware from the review of the records that Dr. Parwatikar's testing from the first trial, that the intelligence—that he stated that his brain—that for intelligence and organic brain dysfunctioning, that his tests were inconclusive?

A. If that was in the report, we would have been aware of it, yes.

Q. Well, knowing that, did you consider having Kenneth tested to get some more conclusive data?

A. We considered whether or not to have Kenneth re-evaluated, and we did not.

Q. Okay. Do you believe it would have been helpful to know prior to trial, his retrial that you were over, that Kenneth suffered from organic brain damage?

A. I believe it could have been helpful, yes.

Q. Do you believe that's the sort of thing you would want to present to the jury?

(Discussion with court as to propriety of question)

A. It could have been, yes.

Q. Why do you think it would have been mitigating?

A. It's possible that there are jurors who would have considered any evidence that would take his crime more out of his own control and, therefore, may have voted for a sentence of life without parole as opposed to a sentence of death.

Q. So if you had known this at the time of trial, would you have presented that evidence?

A. It's possible that we would have presented it, yes.

On cross-examination, Ms. Kraft admitted that offering mitigating evidence sometimes opens the door to other evidence that could be damaging. She also admitted that if she had Kenneth re-evaluated, the evaluation might have confirmed Dr. Parwatikar's assessment. Ms. Kraft further acknowledged that, because Kenley was incarcerated, it was possible that the State could have discovered the results of a damaging evaluation. Finally, Ms. Kraft testified that juries are not always sympathetic to evidence of substance use or abuse.

Mrs. Crownover, a defense witness, testified that she saw Kenley two months before the murder and she concluded that he knew right from wrong at the time. As we noted in *Section II–B,* the evidence of the crime spree is replete with instances of Kenley reasoning, deliberating, and planning.

It was reasonable for defense counsel not to have Kenley re-evaluated in light of Dr. Parwatikar's and Mrs. Crownover's testimony at trial and the evidence adduced about the events of the crime spree. Counsels' representation is presumed to have been effective and their decisions are presumed to have been strategic. Kenley failed to adduce evidence that defense counsels' decisions were not strategic decisions. Ms. Kraft testified that she and her co-counsel consciously decided, after discussion, not to have Kenley re-evaluated. On cross-examination, Ms. Kraft acknowledged that not having a defendant re-evaluated can be a strategic decision to avoid the admission of other damaging evidence. All this evidence demonstrates that a decision was made between two experienced trial attorneys not to pursue a certain line of investigation, which possibly could have further damaged Kenley's case.

Kenley has asserted no impropriety in the initial selection of Dr. Parwatikar. Absent this, defense counsel is not obligated to shop for an expert witness who might provide more favorable testimony. *State v. Taylor,* 929 S.W.2d 209, 225 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1088, 137 L.Ed.2d 222 (1997); *State v. Mease,* 842 S.W.2d 98, 114 (Mo. banc 1992), *cert. denied,* 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993).

Moreover, Kenley has not proven prejudice. First, as we stated in *Section II* of this opinion, the testimony of the three medical experts was conflicting and speculative. Each of the three experts had a different theory supporting why Kenley behaved the way he did on the night of the murder. All three experts relied on incredible evidence of substance abuse or unsubstantiated stories of head trauma. Additionally, all three experts concluded that Kenley was unable to deliberate or control his actions during the crime. Evidence of the crime spree indicates many instances when Kenley deliberated or planned events in advance. The testimony of the experts reinforces the conclusion that an additional evaluation could have led to conflicting and potentially damaging evidence.

Second, much of the evidence offered at the post-conviction relief hearing of abuse by his father and substance abuse was cumulative to what had been presented at trial through the testimony of Dr. Manion, Dr. Parwatikar, and Mrs. Crownover. Evidence of intoxication during the crime spree had been introduced at trial through the testimony of Sandra Buttry. Therefore, the jury already had the opportunity to assess that information and consider it for purposes of mitigation.

Finally, in light of the overwhelming aggravating circumstances—two statutory aggravating circumstances and seven non-statutory aggravating circumstances—and the speculative value of further evaluation, there is not a reasonable probability that the potentially mitigating testimony offered by Kenley would have caused the jury to give a different sentence. It was not error for the motion court to find that counsel was not ineffective.

2.

█ In support of his contention in Point IV that counsel was ineffective for failing to investigate and offer mitigating evidence, Kenley asserts that additional evidence of mental disability or substance abuse would have had a mitigating effect. Kenley presented testimony from the three expert witnesses that he was a substance abuser and

that his capacity was diminished on the night of the murder.

Contrary to Kenley's assertion, mitigating evidence was presented at the sentencing trial. Defense counsel offered evidence of Kenley's dysfunctional family life, his inability to get along with his peers, his violent outbursts, and his compassionate manner in dealing with Mrs. Crownover and Ms. Robart. Defense counsel also elicited testimony and read documents concerning Kenley's father's mental abilities and abusive nature. Testimony was introduced of Kenley's substance abuse problems. Furthermore, defense counsel touched on these mitigating circumstances during closing argument.

Second, Ms. Kraft acknowledged during cross-examination that evidence of substance abuse can be seen as an aggravating circumstance, as opposed to a mitigating circumstance. Therefore, it was reasonable for trial counsel to avoid such evidence to prevent further damage to Kenley's case.

Third, the mitigating evidence presented by Kenley that substance abuse and brain damage caused his inability to control his behavior was incredible in light of the facts of the crime spree. The record is replete with instances of Kenley reasoning, deliberating, and planning.

■ Fourth, the only evidence offered by Kenley to support the contention that defense counsel was ineffective for failing to investigate and offer more mitigating evidence was the testimony of the three expert witnesses called during the Rule 29.15 motion hearing. As we noted above, defense counsel is not ineffective for failing to shop around to find an expert witness who will testify more favorably. *Taylor, supra,* at 225; *Mease, supra,* at 114.

Finally, in light of the overwhelming aggravating circumstances—two statutory aggravating circumstances and seven non-statutory aggravating circumstances—there is not a reasonable probability that the potentially mitigating evidence offered by Kenley would have caused the jury to give a different sentence. It was not error for the motion court to find that counsel was not ineffective.

## IV.

Points V and VIII of Kenley's brief deal with alleged errors in closing argument. Point VIII alleges that the trial court erred in allowing the prosecution rebuttal time during closing arguments. Point V alleges that the motion court erred in not finding counsel ineffective for failing to object to a number of statements made by the prosecutor in closing argument and that the trial court erred in not prohibiting the arguments sua sponte.

### A.

■ Kenley contends that the trial court erred in allowing the prosecution to open and close the summation. Kenley also contends that the error prejudiced him so as to violate his right to due process, his right to a fair trial, and his right to be free from cruel and unusual punishment under the United States Constitution and the Missouri Constitution.

Kenley murdered Ronald Felts on January 3–4, 1984. The law governing the penalty-phase of a first degree murder trial on that date provided that "[t]he prosecuting attorney shall open and the defendant shall conclude the argument to the jury or judge." *Sec. 565.006.2, RSMo 1978.* That provision was repealed on October 1, 1984 and the statute was amended to allow the prosecutor to "open and close the argument." *Sec. 565.001.1, RSMo 1994.* The amendments to chapter 565 apply only to offenses committed after July 1, 1984. Because the murder of Mr. Felts occurred before the effective date of the amendment, Kenley should have been allowed to close the argument. The State conceded that the trial court erred, but denied that the error had a prejudicial effect on Kenley.

■ Trial error warrants reversal only if it has a prejudicial effect on the defendant. In addressing the trial court errors on direct appeal, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *State v. McMillin,* 783 S.W.2d 82, 98 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112

L.Ed.2d 179, *reh. denied,* 498 U.S. 994, 111 S.Ct. 543, 112 L.Ed.2d 552 (1990).

The current procedure of allowing the prosecutor to close argument does not violate due process or result in an unfair sentencing proceeding. Closing argument by the attorneys is not evidence to be considered by the jury. While closing argument is important in a death penalty case, *see State v. Barton,* 936 S.W.2d 781, 783 (Mo. banc 1996), allowing the prosecutor rebuttal did not impinge on defense counsels' opportunity to argue the case. Although Kenley generally claims that he lost a valuable right in not being able to close, he has not established any specific or actual prejudice from the procedure followed. Point VIII is denied.

### B.

Kenley raises eleven claims of allegedly improper argument by the prosecutor during closing argument. Kenley asserts that trial court erred in failing to prohibit the improper arguments or declare a mistrial sua sponte. Kenley further alleges that the motion court erred in not finding defense counsel ineffective for failing to object to these allegedly improper arguments. Analysis of the eleven challenged remarks indicates that the remarks fall into three categories: remarks that were not improper; remarks that arguably were improper but were not objected to as a matter of reasonable trial strategy; and remarks that arguably were improper but not prejudicial.

### 1. Weighing the Value of Lives

■ Kenley challenges the prosecution's argument weighing the value of the victims' lives against the value of his life. The prosecutor argued:

> Ladies and gentlemen, the right of the innocent to live far outweighs the right of the guilty not to die. And I ask you— whose life has more value here—the Defendant's or Ronnie Martin Felts.

Kenley contends that this is precisely the argument which was found to be prejudicially erroneous in *State v. Storey,* 901 S.W.2d 886 (1995). In *Storey,* the prosecutor argued:

> Why do we have the death penalty? The reason we have the death penalty is because the right of the innocent people to live outweighs—by huge leaps and bounds, outweighs the right of the guilty not to die. The right of the innocent completely outweighs the right of the guilty not to die, and, so, it comes down to one basic thing. Whose life is more important to you? Whose life has more value? The Defendant's or [the victim's]?

*Id.* at 902. In *Storey,* we noted that the argument misstated the law because it simplified the death penalty to "one basic thing." *Id.* The balancing of the value of lives argument was couched in the inference that the only purpose of the death penalty was to balance the lives. *Id.* This argument potentially misled the jury into believing that the only inquiry required was whether the value of the victim's life exceeded the value of defendant's life. Taken in whole, that argument is clearly erroneous because the duty of the jury includes considering all of the evidence, applying the law as it is instructed, and balancing the aggravating and mitigating circumstances. Furthermore, in *Storey,* we held that the prosecutor's argument erroneously lumped all persons found guilty of murder into one category. *Id.*

In this case, the balancing of the value of lives was not labeled the "one basic thing" or couched in terms of it being the sole purpose of the death penalty. The jury was not potentially misled into believing that its only inquiry was the balancing of the value of lives. In fact, the argument in this case was immediately preceded by the prosecutor's discussion of balancing aggravating and mitigating circumstances. Additionally, the prosecutor did not erroneously lump all persons found guilty of murder into one category. Because the prosecutor discussed the balancing of the aggravating and mitigating circumstances and did not minimize the death sentence inquiry to "one basic thing", the prosecutor's argument allowed the jury's decision to rest on an individualized inquiry of the character and record of this individual offender, Kenley. *See Romano v. Oklahoma,* 512 U.S. 1, 7, 114 S.Ct. 2004, 2009, 129 L.Ed.2d 1 (1994). The argument was not improper. *State v. Copeland,* 928 S.W.2d

828, 843 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 981, 136 L.Ed.2d 864 (1997). Counsel was not ineffective for failing to make a useless objection. *Sutherland, supra,* at 380.

## 2. The Jury is Society's Last Resort

■ Kenley argues that the prosecutor's statement that the jury was "society's last resort" was an improper attempt to make the jurors the conscience of the community. This Court rejected such a claim in *State v. Roberts, infra,* where the prosecutor stated, "You are the last line of protection in this system; it is up to you whether you protect the citizens of St. Louis County or you don't." The argument was not improper and counsel was not ineffective for failing to object.

## 3. Killing Kenley is Justified

■ The prosecutor argued:

Think about Sheriff Pierce and Deputy Keown as they are out there with headlights on the car when he loads his weapon and starts firing at the police and how they fired back. And if one of those bullets had found its mark, Sheriff Pierce would have been lauded a hero.

If Truman Gaultney when he came out with his shotgun instead of pointing it at the radiator had raised it up a couple of inches and had killed this man then, the headline would have screamed—"Man defends wife, kills murderer."

If the clock had struck 4:00 at the Potosi Correctional Center and Paul Delo would have tackled Ms. Robart, officers would have come in and they were ordered to shoot and kill this man in order to defend themselves. And yes, there would have been an investigation and it would have been determined "actions justified".

Kenley contends that this argument is identical to the argument in *Storey, supra,* at 901–02, which this Court found to be reversible error. In *Storey,* the prosecutor argued that the victim's brother would have been justified in killing the defendant if he had witnessed the brutal murder. *Id.* at 902. We held that argument improper for four reasons. First, it argued facts outside the evidence because the brother did not see the murder. *Id.* Second, the argument was calculated to inflame the jury based on the vivid image of a brother seeing his sister brutally murdered. *Id.* Third, the argument equated the jury's sentencing function with self-defense in the specific crime. *Id.* Fourth, the hypothetical argument was irrelevant and induced the jury to apply emotion. *Id.*

This case is clearly distinguishable. The argument here was not based upon facts outside of the record. The factual basis of each scenario argued was admitted into evidence. Second, the argument did not involve the brother/sister relationship—or any other relationship intended to inflame emotions— as in *Storey.* Although the argument did equate the jury's sentencing function with self-defense, it did not equate it with self-defense in the murder of Mr. Felts. *See Shurn, supra,* at 465 (general reference to self-defense not mentioning this crime is permissible). Therefore, even though the prosecutor argued some facts outside the evidence, the argument did not rise to the level of that in *Storey.* The argument was not improper and counsel was not ineffective for failing to object.

## 4. Wondering if Sandra Buttry Thought She Was Lucky

■ The prosecution argued: "I wonder if Sandra Buttry thinks she was lucky. I wonder as she was jumping from that car and she took a bullet in the back." Kenley contends that this amounts to improper personalization or arguing facts outside the record. The argument was not improper personalization. It did not suggest personal danger to the jurors or their families if Kenley were acquitted.

In *Storey,* we found that an argument by a prosecutor that included the word "wonder" turned the prosecutor into an unsworn witness. *Storey, supra,* at 901. In *Storey,* however, the amount of testifying by the prosecutor outweighed the amount in this case. In this case, the "wonder" was merely an inartful way of arguing that Ms. Buttry suffered greatly from the misfortune of her chance meeting with Kenley. Failing to ob-

ject to this proper argument was not ineffective assistance.

### 5. Kenley Deserved the Ultimate Punishment

▮▮▮ The prosecutor argued:

This Defendant deserves the ultimate punishment. He deserves the death penalty.

Now I want you to consider what evidence you have heard throughout the course of this trial. . . .

Kenley contends that this constitutes improper personalization or expression of the prosecutor's opinion. The argument is not improper personalization. A prosecutor's statement of personal opinion or belief not drawn from the evidence, however, is improper. *State v. Jackson,* 499 S.W.2d 467, 471 (Mo.1973). This particular argument, though, is little more than the prosecutor's recommendation or plea that the defendant be given the death penalty and was immediately followed by a plea that the jury consider the evidence. In context, this argument was not improper. Counsel was not ineffective for failing to object.

### 6. Belief that Kenley was a Juvenile Delinquent

▮▮▮ The prosecutor argued:

He was a kid—he was a juvenile. And as I listened to her read from those records from Farmington [State Hospital], I started thinking—this guy—he's a juvenile delinquent. That's the term I would put on it.

The statement that Kenley was a juvenile delinquent was supported by the evidence. A juvenile delinquent is a child or adolescent who participates in antisocial or criminal behavior. *See* AMERICAN HERITAGE DICTIONARY (2d College ed. 1991). Although this statement might have been somewhat inflammatory, when considered in light of the rest of the evidence, the failure to object to it was not prejudicial.

### 7. Inference on Why Kenley Apologized

▮▮▮ Rebutting defense counsel's argument that Kenley had apologized to Ms. Robart for taking her hostage and that Ken-

ley's prison behavior had improved, the prosecutor stated:

She talked about apologizing to Judy Robart. Yes. Ladies and gentlemen, I submit to you—Kenneth Kenley knew he was going to come back in front of some jury somewhere and that he was going to be evidence for that jury to consider and would it not be in his best interest to go to this woman and apologize?

The same thing with these conduct violations. . . .

But perhaps somewhere along the way it dawns on him or maybe somebody tells him—"Hey, you're going back to trial soon. Toe the line."

Kenley asserts that this statement constitutes improper personalization and opinion evidence. A party, however, may argue reasonable inferences justified by the evidence. *State v. Richardson,* 923 S.W.2d 301, 314 (Mo. banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996). Defense counsel opened the door to this argument by inferring that Kenley apologized or decreased the number of conduct violations because he had turned over a new leaf. It was reasonable for the prosecutor to counter this argument with the fact that Kenley had other potential motives for his behavior. The argument was not improper and counsel was not ineffective for failing to object.

### 8. Prosecutor Screamed and Yelled at the Jury

▮▮▮ Kenley argues that his trial counsel was ineffective for failing to object to the prosecutor's screaming and yelling at the jury. While we do not condone behavior intended to intimidate or inflame the jury, it is difficult to assess from the record exactly how loud the prosecutor screamed, what demeanor the prosecutor exhibited while screaming, and what potential effect this alleged behavior might have had on the jury. The task of judging the prosecutor's demeanor is one best left to the discretion of trial courts.

Although defense counsel did not object to the prosecutor's screaming, she attempted to

turn the argument against the prosecutor in her closing argument by stating:

> And Mr. Hulshof can stand up here and he can scream and he can yell and maybe rightfully so about the actions that Kenneth Kenley has taken during his lifetime. But where were the people like Mr. Hulshof who screamed and yelled when Melvin Kenley pushed Shirley Murphy out of a moving car in front of her son?
>
> Where were the people that screamed and yelled when Melvin Kenley was brandishing a weapon and threatening to kill his mother, his son, his daughter?
>
> Where were the people to scream and yell when Melvin Kenley gave his son a gun to sleep with underneath his pillow?
>
> Where were the people to scream and yell when his mother didn't enroll him in school?
>
> Where were the people to scream and yell when his father and his grandmother would put him into the hospital one day and drag him back out the next? . . . .
>
> Where were the people that screamed and yelled when he was never taken back to see Dr. Maria Manion to get the treatment that he so desperately needed?

* * * *

> Where were the people that screamed and yelled when he rubbed the wet bed clothes in his son's face?

The decision not to object to the screaming, but to respond in another way, was trial strategy and not a ground for ineffective assistance of counsel.

 Kenley further claims his counsel was ineffective for failing to object to the prosecutor's rebuttal that:

> This was killing for the sake of killing. And she says—yeah, I'm yelling and screaming. I'm sorry. I get a little angry when I see senseless violence. This was an unjustified, unprovoked attack on an innocent man—innocent people. Completely senseless. And I get a little miffed.

This argument was in direct response to defense counsel's remarks. The prosecutor is allowed to rebut and explain argument by defense counsel. *State v. O'Neal,* 618 S.W.2d 31, 36 (Mo.1981). To the extent that this argument might have exceeded the prosecutor's right to rebut, it did not create a reasonable probability that the jury would have decided the penalty phase differently.

### 9. Future Dangerousness

 Kenley contends that the argument, "And are you firmly convinced that if you give him this life sentence that there will not be another victim and another and another?", improperly shifted the burden on the defendant to prove that he will not commit any more murders. This argument also came in rebuttal to defense counsels' argument that Kenley's behavior was improving. The argument did not assert that the burden was on the defendant or that the prosecutor's burden was lower than the beyond a reasonable doubt standard. The jury was properly instructed as to what burden the prosecutor bore. To the extent that this statement might have implied otherwise, no prejudice is shown.

### 10. Kenley "Voted to Impose the Death Penalty" on his Victims

 Kenley contends that the prosecutor's use of the phrase "Kenley voted to impose the death penalty" on his victims argues facts outside the record. The use of this metaphor is merely a clumsy attempt at relaying the fact that Kenley had decided to shoot Ronald Felts, Randy Jenkins, and Sandra Buttry. No prejudice has been shown from this rhetorical flourish.

### 11. Equating Sentences

 Finally, Kenley argues that counsel should have objected to the prosecution's argument that Kenley received seven life sentences for the other crimes he committed during the crime spree. Kenley contends that the argument was intended to mislead the jury into thinking that the seven life sentences with parole were equal to what Kenley would receive if the jury decided against a death sentence. This argument is without merit. There is no evidence that the prosecutor intended to deceive the jury. Furthermore, defense counsel quickly rebut-

ted the argument by arguing, "Those were not the kinds of life sentences that we're talking about in this case. In this case we're talking about life without parole· for fifty years—a minimum of fifty years." No prejudice arises from counsels' failure to object to this argument.

### C.

The remarks challenged in points 1, 2, 3, 4, 5, and 7 were not improper argument. Counsel was not ineffective for failing to make useless objections to those remarks and the trial court did not plainly err in failing sua sponte to prohibit proper remarks. The remark challenged in point 8 is not a basis for ineffective assistance of counsel because it was reasonable trial strategy not to object. The trial court did not plainly err in allowing counsel to follow reasonable strategy to combat the prosecutor's remark. Finally, no prejudice resulted from the prosecutor's remarks challenged in points 6, 9, 10, and 11. Because the remarks did not prejudice Kenley's sentencing, no miscarriage of justice occurred. *See State v. Roberts,* 948 S.W.2d 577, 592 (Mo. banc 1997); *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995).

Because Kenley was not prejudiced by the trial court allowing the prosecutor to close arguments and because no plain error arose from the prosecutor's argument, we find the trial court did not commit reversible error. Because counsel was not ineffective with regard to any of the challenged arguments, we find that the motion court did not err in overruling Kenley's Rule 29.15 motion.

Points V and VIII of Kenley's brief are denied.

### V.

 In point VI of ·his brief, Kenley addresses the trial court's alleged error in admitting evidence of Kenley's conduct during his incarceration after his capital conviction. Kenley argues that the trial court committed reversible error when it overruled his objection to the admission of the following evidence: testimony from a correctional officer about Kenley's assault on another inmate, two photos related to the assault, the ice pick Kenley used in the assault, testimony of the functional unit manager and the superintendent of Potosi Correctional Center regarding the hostage situation involving Kenley, and certified copies of the court cases in those two incidents. Kenley further argues that he was denied due process of law, a fair trial, effective assistance of counsel, and freedom from cruel and unusual punishment.

 In Missouri, admitting evidence of subsequent serious assaultive offenses for purposes of proving aggravating circumstances is not reversible error. *State v. Harris,* 870 S.W.2d 798, 813 (Mo. banc), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). The United States Supreme Court also has held, "Consideration of a criminal conviction obtained in the interim between an original sentencing and a sentencing after retrial is manifestly legitimate." *Wasman v. United States,* 468 U.S. 559, 569–70, 104 S.Ct. 3217, 3223, 82 L.Ed.2d 424 (1984). *See also People v. Hovey,* 44 Cal.3d 543, 244 Cal.Rptr. 121, 140–42, 749 P.2d 776, 795–96, *cert. denied,* 488 U.S. 871, 109 S.Ct. 188, 102 L.Ed.2d 157 (1988); *State v. Richmond,* 136 Ariz. 312, 666 P.2d 57, 63–64, *cert. denied,* 464 U.S. 986, 104 S.Ct. 435, 78 L.Ed.2d 367 (1983); *Jones v. State,* 381 So.2d 983, 994 (Miss.), *cert. denied,* 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (1980); *People v. White,* 870 P.2d 424, 442–46 (Colo.), *cert. denied,* 513 U.S. 841, 115 S.Ct. 127, 130 L.Ed.2d 71 (1994); *Commonwealth v. Williams,* 541 Pa. 85, 660 A.2d 1316, 1323 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 717, 133 L.Ed.2d 671 (1996). Point denied.

### VI.

 In point VII, Kenley asserts that the trial court erred in overruling his motion to strike aggravating circumstance because the submitted statutory aggravator, *sec. 565.012.2(3), RSMo 1978,* was unconstitutionally vague and because the evidence did not support the submission of that aggravator to the jury. *Section 565.012.2(3), RSMo 1978,* read as follows:

2. Statutory aggravating circumstances shall be limited to the following:

(3) The offender by his act of capital murder knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person. . . .

*Sec. 565.012.2(3), RSMo 1978.*

## A.

■■■ Kenley's constitutional challenge fails. An aggravating circumstance "may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994). "If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." *Arave v. Creech,* 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993).

The aggravating circumstance in question is not constitutionally infirm because it does not apply to every death penalty candidate. It does not apply to defendants who do not use weapons or devices or to defendants who do not endanger more than one person. Kenley's argument is without merit.

## B.

■■■ Kenley claims that the evidence did not support submission of the aggravator to the jury for two reasons. First, he argues that there was no evidence of risk to more than one person. Kenley asserts that Ronald Felts was standing alone, that only one shot was fired at Felts, and that shot hit its target.

It was not error, however, to find that a great risk to more than one person was knowingly created when Kenley fired the gun at Ronald Felts. At least two people were within a few steps of Ronald Felts when he was shot and the gun was fired from at least twenty feet away. A great risk of death was created to all the others in the Blue Moon Tavern by Kenley's use of a .38 caliber pistol loaded with hollow point bullets, by the possibility of Kenley missing his target, by the possibility of the bullet fragments traveling through Felts' body, by the possibility of a bullet ricocheting, and by the possibility of an unintentional discharge.

Second, Kenley asserts that a pistol is not a weapon "which would normally be hazardous to the lives of more than one person." Kenley relies on *State v. Leisure,* 749 S.W.2d 366 (Mo. banc 1988), *cert. denied,* 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992), and *State v. Griffin,* 662 S.W.2d 854 (1983), *cert. denied,* 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 153 (1984), as examples of what the legislature intended in the language "weapon or device which would normally be hazardous to the lives of more than one person." In *Leisure,* the defendant was convicted of capital murder for killing someone with a car bomb. *Leisure, supra,* at 382. In *Griffin,* the defendant was convicted of capital murder for killing someone with a semiautomatic rifle. *Griffin, supra,* at 860. Kenley's argument is frivolous. A .38 caliber pistol is a weapon "which would normally be hazardous to the lives of more than one person." It was not error for the trial court to find that the evidence supported submission of *sec. 565.012.2(3), RSMo 1978.*

Point VII is denied.

## VII.

■■■ Finally, Kenley challenges the constitutionality of the reasonable doubt instruction, MAI–CR3d 302.04. That instruction states, "Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the truth of a proposition." Kenley alleges that the instruction lowers the burden on the prosecutor from "proof beyond a reasonable doubt" to "proof that leaves you firmly convinced." This argument has been rejected by this Court too frequently to warrant further discussion. *See State v. Kreutzer,* 928 S.W.2d 854, 872 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997); *Copeland, supra,* at 854; *Brown, supra,* at 287.

## VIII.

■■■ Pursuant to *section 565.035, RSMo 1994,* this court independently reviews the sentence of death to determine whether the sentence was imposed under the influence of

passion, prejudice, or any other arbitrary factor; whether the evidence supports the jury's finding of statutory aggravating circumstances; and whether the sentence of death was excessive or disproportionate to the penalty imposed in similar cases.

The Court finds that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor and that the evidence did support the jury's finding of statutory aggravating circumstances.

The evidence supports the jury's finding of statutory aggravating circumstances. As we held in *Section VI–B* of this opinion, evidence supports the jury's finding that, by his act of murder in the first degree, Kenley knowingly created a great risk of death to more than one person by means of a weapon or device that would normally be hazardous to the lives of more than one person.

The jury also found that Kenley committed the murder "for the purpose of receiving money or any other thing of monetary value." *Sec. 565.012.2(4), RSMo 1978.* The murder for money circumstance has been held applicable to a murder committed during the course of a robbery. *State v. Mc-Donald,* 661 S.W.2d 497 (Mo. banc 1983), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985); *State v. Lashley,* 667 S.W.2d 712 (Mo. banc), *cert. denied,* 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984). The statutory language establishing that aggravating circumstance does not limit its application to a killing of the person from whom the money is sought. *Sec. 565.012.2(4), RSMo 1978.* The evidence clearly establishes that the killing of Felts occurred during and as a part of a robbery.

 Finally, we are required to determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." In such a review we look to the facts of the homicide here as compared to similar homicides. We determine these facts from the entire record and transcript and from the trial judge's report. *Lashley, supra,* at 716.

We find this case similar to *State v. Wise,* 879 S.W.2d 494 (Mo. banc 1994), *cert. denied,* 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995); *State v. Oxford,* 791 S.W.2d 396 (Mo. banc 1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 769, 112 L.Ed.2d 789 (1991); *State v. Pollard,* 735 S.W.2d 345 (Mo. banc 1987), *cert. denied,* 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 682 (1988); *State v. Newlon,* 627 S.W.2d 606 (Mo. banc 1982), *cert. denied,* 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982); *McDonald, supra;* and *Lashley, supra.* In all those cases, the capital murder was committed during the course of a robbery. Here, as in those cases, the killing occurred without provocation or resistance by the victim. In this case, the victim was not even the person being robbed, but a bystander who was executed to establish Defendant's control of the scene.

Consideration of Kenley shows a man who commenced a night of life-threatening criminal activity, which included four robberies, three attempted kidnappings, two attempted sexual assaults, and assorted additional felonies. Defendant prepared himself for this crime spree by practicing his marksmanship and acquiring a particularly life-threatening type of ammunition. It is apparent that he embarked upon his activities with the full intent to kill. By happenstance, only one person was killed, but Kenley wounded two others by shooting them in places that could have caused death and attempted to shoot two other people. Kenley showed no remorse for killing Felts, bragging on three occasions that night that he would kill others just like he killed Felts, and telling the arresting officers that they were lucky that they caught him. The sentence is not disproportionate. The nature of the crime and the strength of the evidence support the sentence of death.

### IX.

The judgments of the trial court and the motion court are affirmed.

BENTON, C.J., and LIMBAUGH, COVINGTON, JJ., and GUM, Sr. J., concur.

LAURA DENVIR STITH, Special Judge, concurs in part and dissents in part in separate opinion filed.

ROBERTSON, WHITE and HOLSTEIN, JJ., not sitting.

LAURA DENVIR STITH, Special Judge, concurring in part and dissenting in part.

I respectfully dissent from the majority's conclusion in Part II of its opinion that the motion court's verbatim adoption of the prosecutor's proposed findings of fact does not require reversal and remand for a new hearing. While Missouri courts have repeatedly held that such adoption of a party's findings does not automatically mandate reversal, they have also cautioned that they will reverse where evidence is presented that the findings so adopted do not reflect the independent judgment of the court. That is what I believe to be the case here. In addition, I believe that the court below failed to give Kenley's counsel adequate notice of his intent to amend his findings.

## A. Inadequacy of Motion Court's Initial Judgment Rejecting 29.15 Motion

A more detailed discussion of the judge's actions in ruling on the 29.15 motion is helpful in understanding the basis of my disagreement with the majority. The 29.15 motion was filed following a second penalty phase trial at which the jury again recommended the death penalty and the judge again sentenced Kenley to death. At the 29.15 hearing, Kenley's counsel argued that his penalty phase counsel had been ineffective in failing to present additional evidence of his mental condition and diminished capacity which might have mitigated his punishment. Counsel presented three expert witnesses on these issues and further presented the testimony of Karen Kraft, who along with co-counsel had represented Kenley during his second penalty-phase trial. The only issue at the 29.15 hearing was whether penalty phase counsel was ineffective in failing to present this mitigating evidence and in committing other errors which might have affected the jury and judge's decisions to impose the death penalty.

Following the 29.15 hearing, the State asked the motion court whether it could prepare proposed findings of fact and conclusions of law. The court informed both parties that it would prepare its own ruling and did not require proposed findings from either party. In accordance with this direction of the court, neither party initially prepared proposed findings.

Six days after the conclusion of the 29.15 hearing, the court issued a four-page judgment. The vast majority of the judgment simply recited the allegations of error raised by Kenley and the standard which counsel must meet in a 29.15 proceeding to show entitlement to a new trial. The total of the court's analysis of the issue whether penalty phase counsel was ineffective and whether that ineffectiveness may have affected the decision to impose the death penalty was as follows:

> Clearly, counsel made certain choices at trial. Under the law of *Strickland,* this court is unable to find a constitutional inadequacy in Movant's defense at trial.
>
> Movant presented the testimony of two psychologists and a psychiatrist at this hearing. The thrust of their testimony was that Kenneth Kenley came from a dysfunctional family and had a difficult childhood. Such is hardly a defense to intentional murder.
>
> One of the two defense counsel testified. She obviously was very distressed that her client had received the death penalty. However, her testimony failed to show that there was inadequate performance of counsel.
>
> A brief mention of the facts of the offense indicated Mr. Kenley took a gun into a bar and killed a man who looked at him because he was afraid the man would be able to identify him. It is difficult to imagine a more cold blooded, needless act.
>
> The motion of the Movant and all parts thereof is denied.

This ruling was clearly inadequate, and had it stood, it would have been reversed on appeal for this reason. It failed to deal with most of the issues raised by Kenley and gave those issues it did address such a broadbrush treatment that review of the ruling is

rendered extremely difficult. *Toney v. State,* 730 S.W.2d 295 (Mo.App.1987) (judgment which denies post-conviction relief based on conclusory statements that movant is not entitled to relief without addressing all issues presented is inadequate and must be remanded).

From the limited information which can be gleaned from the ruling, however, it appears that the judge did not adequately understand either the facts of the case or the relevant law. In regard to the facts, the judge stated that Kenley killed the victim because Kenley was afraid the victim would be able to identify him. To the contrary, and as the majority notes, the evidence showed that Kenley shot the victim to establish his control over the bar when he saw that the victim and others failed to immediately obey him. There was absolutely no evidence that a desire to avoid identification motivated the killing. Indeed, there was no evidence of previous acquaintance of Kenley and the victim, and there were dozens of other people in the bar with Kenley and the victim who could and did later identify Kenley. While, had the judge accurately determined Kenley's motive for the killing, he may still have ruled that it was difficult to imagine a more cold blooded and needless act, such a determination should, and must, be made on the actual facts, not on inaccurate ones.

The court's analysis of the defendant's extensive expert testimony was equally inadequate. He summarized "the thrust" of that testimony as being "that Kenneth Kenley came from a dysfunctional family and had a difficult childhood. Such is hardly a defense to intentional murder." Indeed, the court was right that a difficult childhood is not a defense to intentional murder. The issue the court was to address, however, was not whether Kenley had a defense to intentional murder but whether he received ineffective assistance in the penalty phase trial, a trial addressed not to Kenley's guilt or innocence but to whether he should receive the death penalty or life imprisonment.

The fact that Kenley came from a dysfunctional family and had a difficult childhood is very relevant to whether he should receive the death penalty. In fact, it was in large

part due to the very failure to present evidence addressed to these issues in the first trial that the Eighth Circuit ordered that the State either sentence Kenley to life imprisonment or hold a second penalty phase trial. *Kenley v. Armontrout,* 937 F.2d 1298, 1308 (8th Cir.), *cert. denied sub nom., Delo v. Kenley,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991). The focus of the evidence at Kenley's second penalty phase trial was purposely addressed to his dysfunctional family and difficult childhood. In the 29.15 hearing, the defendant's position was that this testimony would have been strengthened by further expert evidence as to his deficient psychological and allegedly brain-damaged state at the time of the crimes and as to his alcohol and drug abuse problem. If believed, then this is the very type of evidence which might, indeed, be a defense to imposing death as the penalty for Kenley's intentional murder of the victim. Yet, the trial court thought it was irrelevant since it was not a defense to Kenley's guilt of the murder itself.

### B. Adoption of Attorney General's Proposed Amended Findings Violated Rule 75.01 and Kenley's Right to Notice

The attorney general's office was certainly aware of these and other inadequacies of the court's initial ruling, for after receiving the judgment, the assistant attorney general who had handled the hearing wrote a very unusual letter to the judge. The letter stated in relevant part:

I have received your Findings of Fact and Conclusions of Law in the *Kenley* case. While I certainly agree with your ruling, I do have some concerns.

As I am sure you are aware, death-penalty cases often receive a heighten [sic] level of scrutiny and are subjected to a more rigorous review process. Having experienced the phenomena first-hand, I find myself looking at the findings and conclusions in this case with a more critical eye than usual. This is especially true given the manner by which this case arrived in your court. In any other case, I would consider your findings and conclusions to be more than adequate, and they would

not give me any pause. I believe in a case such as this, however, that more detailed findings of fact and conclusions of law would benefit all concerned parties. As a result, I would ask you to consider more comprehensive findings and conclusions in this case.

I hope the Court understands that this suggestion is not intended as a criticism, and I hope that you will not interpret it that way. I am only interested in this case progressing in a timely fashion and, given the close scrutiny this case has received in the past, I do not want it delayed for procedural reasons. Therefore, I hope it is understood that this letter is not a criticism.

The assistant attorney general attached to this letter a 29–page set of findings of fact and conclusions of law. They were not labeled as proposed, and they had a place for signature by the judge. The judge adopted these findings verbatim.

Kenley now argues on appeal that in so doing the trial court violated his constitutional rights, and further violated Missouri Rule 75.01. That rule states in relevant part:

> The trial court retains control over judgments during the thirty-day period after entry of judgment and may, *after giving the parties an opportunity to be heard and for good cause,* vacate, reopen, correct, amend, or modify its judgment within that time.

*Rule 75.01* (emphasis added).

The majority finds that Kenley has waived his right to object to the motion court's adoption of the State's findings because his counsel was given notice of the State's intention to submit proposed findings and was supplied a copy of the State's proposed findings, yet failed to propose any findings of his own or object to the State's proposed findings.

I respectfully disagree with the majority's conclusion that this issue was not preserved. First, the only written notice Kenley's counsel received of the attorney general's intent to submit proposed findings was when she read the cover letter to which the proposed findings were attached. That letter was dated April 22, 1996.

The attorney general's letter itself recognized that the trial court could not just adopt her proposed findings without giving Kenley's counsel a chance to prepare her own proposed findings. The final paragraph of her letter to the motion court thus stated:

> I have already contacted Mr. Kenley's attorney, Loyce Hamilton, and informed her of my intention to ask you to amend your findings. I also requested that she submit proposed findings and conclusions for your consideration. After receiving Ms. Hamilton's proposed findings, I would ask that the Court issue more detailed findings of fact and conclusions of law in this case prior to May 7, 1996, the date on which the Court will lose jurisdiction over the case. I appreciate your assistance in this matter.

The letter does not state when the attorney general contacted Kenley's counsel to indicate that she would ask the court to amend its findings. We cannot presume from the language of the letter that this was anything more than a courtesy call made on or shortly before the date that the attorney general sent the court her letter and proposed findings. In any event, the letter makes it evident that the attorney general anticipated that the court would wait for Kenley's counsel to offer her own proposed findings before deciding whether to adopt those submitted by the attorney general.

It is questionable whether Kenley's counsel had any obligation to respond to the attorney general's letter and proposed findings at this point, for Rule 75.01 requires *the court* to give the parties an opportunity to be heard before it amends its findings. The last indication from the court on this issue was that it did not want the parties to submit proposed findings, but preferred to prepare its own. It then did just that, entering its judgment denying the Rule 29.15 motion. It was only at this point, after judgment, that the assistant attorney general sent unsolicited findings to the court and took it upon herself to tell opposing counsel she was free to do likewise. It would be reasonable in this situation for opposing counsel not to offer its own findings until it was informed by the court that it was considering amend-

ing its judgment and wanted to give the parties an opportunity to be heard on that issue. In other words, notice that the court was considering amending its judgment should and must come from the court, not the attorney general.

Even if we were to believe that Kenley's counsel should have somehow known that it was incumbent on her to offer alternative findings without any notice by the court that it intended to amend its judgment, however, the record makes it clear that Kenley's counsel was not given adequate time to prepare any alternative findings. As noted, the attorney general's proposed findings were mailed on Monday, April 22, 1996. At best, Ms. Kenley's counsel would have received these proposed findings on Wednesday, April 24, 1996. Assuming three days for mailing, as required by Rule 44.01(e), they would not have been received by Kenley's counsel until Thursday, April 25, 1996. The letter and proposed findings do not have a file-stamped date, and thus we do not know if they were mailed or hand-delivered. If mailed, they may not have been received by the court until April 25, 1996, either.

The court entered its amended findings and conclusions, by signing the pleading sent to it by the attorney general without a single change, on Friday, April 26, 1996. This was one to two days after the attorney general's proposed findings would have even been received by Kenley's counsel, and perhaps by the court. This did not give Kenley's counsel time to even respond to the attorney general's proposed findings, much less to draft and offer a set of proposed findings of her own. It also reflects a failure by the motion court to comply with the minimum time limits for responding to a motion set out in Rule 44.01(d). That rule states in relevant part, " written motion, other than one which may be heard ex parte, and notice of the hearing thereof shall be served not later than five days before the time specified for the hearing...." *Rule 44.01(d)*. Certainly the attorney general's letter is in the nature of a motion to amend, thus invoking Rule 44.01(d)'s time limits. These limits could not be avoided by the mere fact that the attorney general's office sought to soften the effect of its motion by cloaking it in the informality of a letter rather than properly putting it in pleading form.

In these circumstances, I disagree that Kenley has failed to preserve his objections to the judge's adoption of the attorney general's proposed findings. I believe that the Court should reach the merits of Kenley's complaint under Rule 75.01. I believe that the complaint has merit on two grounds, the first of which grows out of the facts just discussed. As there noted, Rule 75.01 states that the court can amend its judgment within the 30 days after judgment only after giving the parties an opportunity to be heard. For all of the reasons just stated, Kenley did not have an opportunity to be heard before the judgment was amended. The last communication from the court on the issue was his direction that the parties not submit proposed findings. When the assistant attorney general *sua sponte* prepared proposed findings in response to what she realized were inadequate findings of the motion court, she also recognized that, and advised the court that, opposing counsel needed time to offer alternative findings. No time was given. Within just a few days, without notice and before opposing counsel was given an opportunity to be heard, the court adopted the attorney general's proposed findings verbatim.

This was error. Our courts have repeatedly recognized that Rule 75.01 requires that before a court can enter an order setting aside or amending a judgment it must give notice to the parties and an opportunity to be heard. The Eastern and Western Districts of the Court of Appeals have disagreed as to whether an order entered without affording the parties an opportunity to be heard is void or merely voidable, but both have recognized that it cannot stand. *Compare State ex rel. Kairuz v. Romines,* 806 S.W.2d 451 (Mo.App. E.D.1991) (holding such an order void) *with Todd v. Todd,* 762 S.W.2d 449 (Mo.App. W.D. 1988) (holding an order made without notice voidable). As *Kairuz* noted, the last Missouri Supreme Court to address this issue on the merits held that an order entered without notice and an opportunity to be heard is null and void. *Hewitt v. Chicago, B. & Q.R. Co.,*

426 S.W.2d 27, 29 (Mo.1968), *citing Albert J. Hoppe, Inc. v. St. Louis Pub. Serv. Co.,* 361 Mo. 402, 235 S.W.2d 347 (banc 1951). Applying *Hewitt,* I would hold the motion court's amended judgment void here. Should the majority determine that such an order is merely voidable, however, the result would be the same. The amended judgment should be held for naught. This has the effect of reinstating the motion court's initial judgment. As that judgment is patently inadequate, I would remand with directions that the court either hold a new hearing on the Rule 29.15 motion or, at a minimum, enter a new, detailed, judgment after providing both parties with an opportunity to be heard and to submit proposed findings. I would further admonish the motion court to carefully consider the issues raised and, in light of the procedural history of this case, to prepare its own findings rather than adopt those proposed by either party.

C. *The Trial Court Failed To Exercise Independent Judgment In Adopting the Attorney's General's Proposed Findings Verbatim.*

I would also remand for new findings for an additional, independent reason. As the majority notes, this Court has in the past recognized that it has become commonplace for courts to adopt findings and conclusions proposed by the parties. While judges often make at least some changes or additions to these proposals, this is not necessarily required. Nonetheless, the Court has repeatedly expressed its dislike for the practice of adopting findings and conclusions without change.

Thus, as the Court stated in *State v. Griffin,* 848 S.W.2d 464 (Mo. banc 1993), "For obvious reasons, when a court adopts in its entirety the proposed findings of fact and conclusions of law of one of the parties, there may be a problem with the appearance. The judiciary is not and should not be a rubber-stamp for anyone." *Id.* at 471–72.

Similarly, in *Massman Constr. Co. v. Missouri Highway & Transp. Comm'n,* 914 S.W.2d 801 (Mo. banc 1996), the Court noted that:

the trial judge followed the often troublesome practice of adopting, without modification, significant portions of a proposed order prepared by respondent's counsel. Advocates are prone to excesses of rhetoric and lengthy recitals of evidence favorable to their side but which ignore proper evidence or inferences from evidence favorable to the other party. Trial judges are well advised to approach a party's proposed order with the sharp eye of a skeptic and the sharp pencil of an editor.

*Id.* at 804.

Nonetheless, the fact that a trial court has adopted the findings offered by one party does not require reversal. Instead, as the Court stated in *State v. White,* 873 S.W.2d 590 (Mo. banc 1994):

As long as the court thoughtfully and carefully considers the parties' proposed findings and agrees with the content, there is no constitutional problem with the court adopting in whole or in part the findings of fact and conclusions of law drafted by one of the parties. *Once the trial court determines that it agrees with one of the parties' findings* and signs the order, the court has in effect adopted that party's findings as its own.

It is clear from the record that the prosecutor drafted some or all of the August 1, 1990, findings of fact and conclusions of law. We find no constitutional violation regarding this practice as long as the trial court is satisfied that its findings of fact and conclusions of law reflect its independent judgment. *Because there was no evidence presented that the findings and conclusions did not reflect the court's own independent judgment, this point is denied.*

*Id.* (emphasis added).

Thus, where, as here, the motion court has adopted the findings of the State verbatim, the issue becomes whether evidence has been presented that the findings and conclusions did not reflect the court's own independent judgment. Of course, it is difficult to develop such proof.

One way proof of lack of independent judgment can be shown is by demonstrating that

the findings and conclusions are not supported by the record, in that they include factually inaccurate findings or findings as to which there is no substantial evidence. This is the issue addressed by much of the majority's opinion. It reviews the findings signed by the court, and concludes that there was evidence in the record which supports each finding. For example, it finds that, based on the record, the trial court could have disbelieved a particular expert, or could have disbelieved evidence of Kenley's alleged alcohol and drug dependence, and so forth.

I agree with the majority's analysis, as far as it goes. The amended judgment submitted by the State systematically summarizes all of the evidence favorable to the State in the form of findings of fact. Every time it mentions evidence favorable to Kenley, it systematically rejects it, each time leading off its analysis with the statement that it did not find that particular defense witness credible. Yet, as the majority notes in its excellent and thorough analysis of the record, there is evidence in the record which, if believed, supports each finding in the form of judgment submitted by the attorney general and adopted by the trial court.

The majority ends its analysis here, however. It, in effect, concludes that because a judge exercising independent judgment *could have* adopted these findings and conclusions, the judge below *must have* exercised independent judgment. While I agree with the former proposition, I do not agree that this means that the court does not need to go on and consider whether this particular judge in fact exercised independent judgment. This is particularly true where, as here, the issue before us is whether to affirm the imposition of the death penalty. The Florida Supreme Court noted this principle in remanding for a new penalty phase hearing in a case in which the judge who heard the original penalty phase trial died before he could rule. Florida rules provide that in such circumstances another judge should review the record and then pass sentence. In holding that this rule, while normally adequate to protect a party's rights, is improper in a death penalty case, the Florida court stated:

[I]n adopting this rule, we did not take into account death penalty cases and the very special and unique fact-finding responsibilities of the sentencing judge in death cases. The trial judge has the single most important responsibility in the death penalty process. Under this process, a trial judge may not impose the death penalty unless he or she articulates in writing his or her factual findings and reasons for imposing the death penalty. We have recognized the unique responsibilities of the sentencing judge in this regard and the necessity for independent evaluations and written factual findings concerning aggravating and mitigating circumstances in imposing the death sentence.

... We conclude that fairness in this difficult area of death penalty proceedings dictates that the judge imposing the sentence should be the same judge who presided over the penalty phase proceeding.

*Corbett v. State*, 602 So.2d 1240, 1243–1244 (Fla.1992).

A similar approach has been espoused by the United States Supreme Court in reviewing procedures for imposition of the death penalty. The Court has upheld such procedures in numerous cases precisely because it has found that under the relevant state's law, for instance, "[i]f a death sentence is imposed, the sentencing authority articulates in writing the statutory reasons that led to its decision." *Proffitt v. Florida*, 428 U.S. 242, 259, 96 S.Ct. 2960, 2970, 49 L.Ed.2d 913, 926 (1976). This, the Court has noted, allows for meaningful review and ensures that the penalty is not imposed indiscriminately or arbitrarily. *Id.*

In *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), however, application of these principles required the Court to reverse a death sentence imposed by a judge after the jury had recommended life imprisonment. The judge's order simply stated that the judge believed that mitigating factors were outweighed by aggravating ones, but did not identify what these factors were. The Court said that this was inadequate, rejecting the argument that "trial judges can be trusted to exercise their discretion in a responsible manner, even though

they may base their decisions on secret information. However acceptable that argument might have been before *Furman v. Georgia* [408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)], it is now clearly foreclosed." 430 U.S. at 360, 97 S.Ct. at 1206, 51 L.Ed.2d at 403.

Similarly here, because we deal with a death penalty case, I do not believe the Court can rely on the assumption that the motion court's findings must have reflected the judge's independent judgment, nor can we even assume that the judge's wholesale adoption of the State's proposed findings necessarily means that he agreed with each of them. I do not believe we can affirm simply by deciding that a reasonable judge could reach the findings and conclusions set out in the court's judgment. We must determine whether the judge below, the judge who actually heard the evidence, exercised his or her independent judgment in adopting the attorney general's findings. In order to do this, it is incumbent upon us to review the remainder of the record to see whether there is other evidence that the judge did not exercise independent judgment.

In undertaking this analysis, we should be guided by the fact that proof of a lack of independent judgment will usually be circumstantial. Here, however, in addition to much circumstantial evidence, we have the exceptional presence of direct evidence—two written judgments, the one prepared independently containing findings and conclusions unsupported by the record and inadequate to support the denial of post-conviction relief; the other prepared by an advocate without opportunity for response by the adverse party containing numerous factual propositions the court did not mention in its initial, independently-prepared judgment and omitting material contained in its initial judgment. That initial judgment was four paragraphs in length and showed little understanding of the complexities of the issues before the court. By contrast, the amended judgment was 29 pages, and the majority itself devotes the first 30 pages of its opinion to issues dealing with the facts, the findings in the amended judgment, and whether they were supported by the evidence.

I also note that the initial judgment did not find any of the defendant's witnesses not to be credible, but instead seemed to credit defense testimony, but simply misconceived the issue as whether the proffered evidence demonstrated lack of guilt of the crime charged rather than whether there was ineffective assistance of counsel in the penalty phase of the trial which followed the guilty verdict. For this reason, apparently, the court focused on whether Kenley was competent to be held guilty for murder despite his difficult childhood. That was not the issue before him, however. In any event, the initial judgment fails to accurately set out either the nature of the testimony which Kenley says should have been presented at his penalty phase trial, or the most basic facts of the murder. By contrast, the amended judgment is directed to the evidence that was presented and the issues before the court. It finds each defense expert not credible, and properly analyzes how their testimony fits with the defense and prosecution theories.

The contrast between the two judgments necessarily creates doubt that the court exercised independent judgment while so fundamentally shifting the basis for its decision and reaching such different conclusions and such a broad reorientation of his understanding of the issues in the brief period after receipt of the attorney general's letter.

These doubts might be allayed if the motion judge had kept and studied the State's proposed findings for a reasonable period of time, and either marked them up and adopted some while rejecting others, requested and considered proposed findings from Kenley, or waited for objections to the State's proposals, or at least notified Kenley's counsel that the court was considering amending its findings and adopting those proposed by the state. None of these events occurred, however. Instead, the court adopted the State's findings and conclusions four days after they were mailed, without notice to Kenley and without notice that it would amend its findings or an opportunity for Kenley to be heard, whether by submitting alternative findings and conclusions or by submitting objections to those proposed by the State. In fact, even if Kenley's coun-

sel had prepared proposed findings or objections and mailed them the next day, they would not have reached the judge before he ruled.

Finally, we must consider that the court adopted the State's proposed findings absolutely verbatim. This would not be surprising in a simple case involving a few simple issues, where most people might agree on what findings and conclusions were needed to reach a particular result. Here, however, the proposed findings covered 29 pages. They were extremely complex, going over detailed aspects of the record and the law. They also uniformly found every State's witness to be credible, and every defense expert not to be credible, findings absent from the initial, independently-prepared judgment and which, defense counsel suggests in this Court, the attorney general may have purposely included in the proposed findings so as to preclude later federal habeas corpus review of key issues raised below. This finding of lack of credibility also justified the motion court, and justifies this Court in reviewing the motion court's ruling, in ignoring or giving no weight to defense evidence. While I agree with the majority that a rational judge might have made each of these determinations, I find it exceedingly indicative of a lack of independent judgment that the motion court made all of them in exactly the terms suggested by the attorney general.

A similar situation faced the Maine Supreme Court in a civil context in *Clifford v. Klein,* 463 A.2d 709 (Me.1983). The judge in *Clifford* solicited proposed findings of fact and conclusions of law only from defense counsel. He then adopted them verbatim without giving prior notice to the plaintiff's counsel of his intent to do so or of his request to defense counsel. The court first stated that, while it did not disapprove of adoption of findings proposed by a party, it would "remand for new findings in those instances where this Court is uncertain whether the judicial function has been adequately performed." *Id.* at 712–13. It found it had such uncertainty in the case before it, stating:

Not only did the trial justice solicit proposed findings from only one party, *thereby depriving himself of the opportunity to weigh the views of counsel for both parties,* but more importantly, in soliciting proposed findings from the prevailing party, the justice failed to give counsel for that party any indication of the rationale for his decision. This is not the type of case in which the basis for the justice's decision was readily apparent. The evidence adduced at trial was extensive and in part conflicting. The proposed judgement drafted by counsel for the prevailing party attempted to review this testimony at length and in the process rejected selected portions of it. *We believe it highly unlikely that counsel=s perception and the portrayal of this testimony would have been identical to that of the presiding justice. The evidence adduced at trial was too extensive and too complex for counsel to have been able to divine the rationale supporting the decision of the court.*

*Id.* at 713 (emphasis added). *See also, Ramey Constr. Co., Inc. v. Apache Tribe of Mescalero Reservation,* 616 F.2d 464, 467 (10th Cir.1980) (noting that verbatim adoption of findings proposed by party mandates their review with a more critical eye and that here, "[a]lthough the trial court may well have performed its judicial function in this case, viewing the findings and the record with a critical eye, we cannot be sure that it did so.").

Nearly every doubt attending the judgment in *Clifford* is present here; only one party's views were considered;[1] that party prepared its proposed findings without receiving input from the judge as to the basis of his views; the evidence was so complex and the evidence so extensive that it is "highly unlikely that counsel's perception and the portrayal of this testimony would have been identical to that of the presiding judge." *Clifford,* 463 A.2d at 713. For all of these reasons, as did *Clifford,* I believe that the facts necessarily raise considerable doubt (if

---

1. Of course, in *Clifford,* the judge actually solicited proposed findings from only one party. Here, by contrast, the court received unsolicited findings from the State, but then adopted them without giving notice or an opportunity to respond to the defendant. The effect of these two departures from proper procedure is the same.

not outright disbelief) that the motion court exercised independent judgment in adopting the State's proposed findings and conclusions.

Whether or not such doubt that the amended judgment reflects independent judgment would be a sufficient basis to remand in a non-capital case, it certainly does provide a sufficient basis to remand in this capital case. As the United States Supreme Court has repeatedly noted:

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of this qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976).

Moreover, precisely because of the qualitative difference between death and other forms of punishment permitted under our laws:

> although not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state-court judgment, the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error.

*Zant v. Stephens,* 462 U.S. 862, 884–85, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235, 255 (1983) (citing *Woodson,* 428 U.S. at 305, 96 S.Ct. at 2991, 49 L.Ed.2d at 961). Applying such scrutiny to a death penalty case in which the trial court simply told the state's attorney that he believed the aggravating circumstances outweighed the mitigating circumstances and left it to the state's attorney to draft findings in accordance with that decision, the Florida Supreme Court remanded for a new sentencing hearing, stating "the trial judge's action in delegating to the state attorney the responsibility to identify and explain the appropriate aggravating and mitigating factors raises a serious question concerning the weighing process that must be conducted before imposing a death penalty."

*Patterson v. State,* 513 So.2d 1257, 1262 (Fla. 1987).

Here, too, because the circumstances surrounding the adoption of the State's proposed findings raise not just colorable, but substantial, doubt as to the independence of the judgment exercised by the motion court, we should reverse and remand for a new 29.15 hearing and for independent findings of fact and conclusions of law.

For these reasons, I dissent from the majority's decision to affirm the judgment below.